UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
                      Civil No. 15-3670(DSD/HB)

Michelle Walker,

       Plaintiff,

v.                                                      **ORDER**

South Washington County Schools,
Independent School District #833
and Julie Nielsen,

       Defendants.

    David H. Redden, Esq. and Fabian May & Anderson, PLLP, 1625
    Medical Arts Building, 825 Nicollet Mall, Minneapolis, MN
    55402, counsel for plaintiff.

    Kristin C. Nierengarten, Esq., Trevor S. Helmers, Esq. and
    Rupp, Anderson, Squires & Waldspurger, 333 South Seventh
    Street, Suite 2800, Minneapolis, MN 55402, counsel for
    defendants.

This matter is before the court upon the motion for summary judgment by defendants South Washington County Schools, Independent School District #833 (the District), and Julie Nielsen. Based on a review of the file, record, and proceedings herein, the court denies the motion.

**BACKGROUND**

This employment action arises out of the non-renewal of plaintiff Michele Walker's contract. The District hired Walker, an African American, in 2011 as a school psychologist in the special

education department.  She was subject to a three-year probationary period during which the school board could non-renew her employment at will.  Walker was responsible for coordinating and completing evaluations to determine whether students are eligible for special education services.  Walker was one of very few minorities employed by the District.  Nielsen Dep. at 108:1-5.

In her first year, the 2011-2012 school year, Walker worked at Royal Oaks Elementary School and Bailey Elementary School.  A progress review dated February 7, 2012, indicates that Walker was proficient in her duties.[1]  Redden Decl. Ex. 1 at 1.  According to her supervisor at the time, Theresa Blume-Thole, Walker was "professional, structured, genuine and committed to her profession."  Id. at 1.  Blume-Thole further commented that Walker needed "additional time to transition effectively, gain knowledge and confidence as a facilitator."  Id.

During the 2012-2013 school year, Walker worked most days at Middleton Elementary School and one day a week at Woodbury High School. Defendant Julie Nielsen, Middleton's principal, supervised Walker at Middleton.  In a November 2012 progress review, Nielsen indicated that Walker was proficient in her job. Nierengarten Aff. Ex. 2 at 1.   Nielsen commented that Walker (1) established "positive relationships with staff in the building and presents

---

[1] The performance scale includes the following selections: unsatisfactory, basic, proficient, and distinguished. Redden Decl. Ex. 1 at 1.

2

herself in a calm, confident, matter of fact manner," (2) did "an excellent job preparing reports for parent meetings," and (3) prepared timely reports. Id. at 1-2. Overall, Nielsen was "pleased with [Walker's] performance." Id. at 2. Nielsen also commented, however, that Walker needed to "at times ... act with more intensity and/or a quicker pace." Id. at 1. She noted that Walker's "biggest challenge will be keeping up on the paperwork" but noted no specific instance in which Walker had failed to meet expectations in this regard. Id.

In a February 2013 performance evaluation, Walker's supervisor at Woodbury High School, Todd Herber, indicated that Walker's performance with respect to "professional responsibilities" was basic and that she was proficient with respect to her special education duties. Id. Ex. 4 at 1. Herber observed Walker conduct an evaluation meeting with a case manager, student, and grandparent and noted that Walker did a "nice job" during the meeting and shared that the case manager appreciated Walker's "professionalism" and "timeliness." Id. at 2. Herber concluded the evaluation by stating that Walker was a "skilled employee who ha[s] demonstrated her skills in working with our parents and case managers." Id. Referencing a situation in which Walker felt harassed by a colleague, Herber also noted that "she needs to be able to navigate conflicts with her colleagues and seek common ground." Id.; see Nierengarten Aff. Ex. 6.

In March 2013, Dr. Nancy Meyer, a District special education supervisor, rated Walker as proficient and commented favorably about her work. Redden Decl. Ex. 2; Nielsen Dep. at 102:2-9. Meyer encouraged Walker to share her knowledge and ideas with colleagues because she can be "soft-spoken when in a larger group." Redden Decl. Ex. 2 at 1.

In the summary evaluation for the 2012-2013 school year, Nielsen and Herber rated Walker between basic and proficient in the domain of professional responsibilities and proficient in the domain of special education. Nierengarten Aff. Ex. 5 at 1. They recommended that Walker continue on as a probationary teacher in the following school year. Id. Nielsen requested that Walker be assigned to Middleton full time. Redden Decl. Ex. 4.

Walker worked exclusively at Middleton during the 2013-2014 school year, her third and final year as a probationary teacher. Nielsen remained her supervisor, except for the period between August and November 2013, when Nielsen was on special assignment with the District. Nielsen Dep. at 68:2-11. Karen Toomey served as acting principal during Nielsen's absence. Id. at 68:12-24. After observing Walker, Toomey submitted a progress review rating her as proficient in all areas. Redden Decl. Ex. 3 at 1. Toomey commented that Walker was "a supportive team player who works well with her colleagues" and that she demonstrated "warmth, caring and respect" when working with families. Id.

4

Toomey recommended that Walker take more initiative and a more active role so that others could "benefit from her expertise and skills." Id.

In early 2014, Walker applied for a program within the Minneapolis public schools as part of her effort to earn an administrative degree. Nielsen Dep. at 117:1-8. Nielsen recommended Walker for the program, commenting that Walker would be an "excellent candidate." Redden Decl. Ex. 5 at 1.

In a February 2014 progress review, Nielsen rated Walker above proficient in all areas and commented positively about her performance. Nierengarten Aff. Ex. 8 at 1-2. Nielsen also noted that Walker needed to work on "scheduling meetings, updating agendas and getting checklists out to teacher[s] prior to the time that they are due back." Id. at 1. She noted, however, that Walker was "very receptive" to that feedback. Id. Dr. Meyer again observed Walker in February 2014 and rated her as proficient. Id. Ex. 9 at 1.

In March 2014, Nielsen completed a summary evaluation of Walker rating her as basic in the domain of professional responsibilities and proficient in the domain of special education. Id. Ex. 12. Nielsen recommended that Walker be elevated to continuing contract status, which meant that she would no longer be a probationary employee terminable at will. Id.; Griffith Dep. at 21:15-25.

Despite her recommendation, Nielsen testified that she was "on the fence" about recommending continuing contract status for Walker. Nielsen Dep. at 111:23-112:2. She spoke to Denise Griffith in the human resources department about her concerns. Id. at 112:18-24. Nielsen told Griffith that Walker had difficulty with interpersonal relationships and that she was not meeting state-mandated evaluation deadlines.[2] Griffith Dep. at 24:13-18.

According to defendants, Walker's performance declined dramatically following Nielsen's decision to recommend continuing contract status. First, Walker was absent for a training session she was scheduled to conduct with a colleague, Tara Dahlager. Walker acknowledges that she was absent for the session, but explains that she was ill and that she notified Dahlager by email the prior evening that she would be unable to attend the session. Walker Dep. at 176:12-178:3. Although it appears that Walker may have sent the email to the wrong address, the record supports Walker's claim that she attempted to notify Dahlager of her absence. See Nierengarten Aff. Ex. 13. There is no evidence in the record that Nielsen investigated the incident to determine why Walker missed the training or whether she attempted to notify

---

[2] Defendants support the latter accusation with a list of purportedly late evaluations in their interrogatory responses. See Nierengarten Aff. Ex. 6. Defendants have not provided the underlying documentation to the court. Walker acknowledges that she may have belatedly submitted one late evaluation during her first year, but denies that she routinely submitted untimely evaluations. Walker Dep. at 107:3-12.

Dahlager of her absence.

Second, Walker's colleague, Karen Holine, reported that Walker lied about timely completing an evaluation plan, which resulted in a confrontation during a meeting.  Holine Dep. at 39:1-25, 40:1-5, 54:22-55:18; Walker Dep. at 184:11-18.  Walker denies that she did not complete the plan on time.  Walker Dep. at 183:20-187:17.  The record is insufficient to resolve the issue.  It is clear, however, that Nielsen did not investigate the matter to determine whether Walker had been dishonest.  See Nielsen Dep. at 156:17-157:1.

Third, Walker had a heated exchange with another colleague, Becky Max, during a meeting to discuss whether an African American student should be retained in kindergarten for the following school year or be evaluated to determine whether he qualified for special education services.  Max, who Walker believed disliked her,[3] apparently favored retention, which Walker opposed.  Walker felt that Max's position was racially motivated.  Walker Dep. at 208:1-10, 228:6-229:10. Following a meeting in which the student was discussed, Max sent Walker an email noting that Walker had been abrupt and rude at the meeting.  Redden Decl. Ex. 15 at 1.  She requested that they handle their differences in a respectful way. Id. at 2.  In response, Walker escalated the situation by making

---

[3] Walker's belief was correct.  Emails disclosed during discovery reveal that Max routinely made derogatory comments about Walker and her abilities to other colleagues.  See Redden Decl. Exs. 9, 10, 11, 12, 13, 14.

7

the following statements:

- Directness, whether it's a look or a question, seems to be just as welcomed by you as differentness is.

- I am all for respectful discourse, but it must be two sided and open, otherwise, it is not respect; it is me playing your game the way you expect it to be played.

- When diversity is introduced into homogeneity, things don't always go according to the rules that we are accustomed to. That is where tolerance and true respect come into play.

Id. at 2-3. Walker sent a copy of her response to Nielsen. Id. at 2. Max and Walker exchanged two more unpleasant emails, after which Nielsen instructed them to stop communicating and to meet with her the following Monday, April 7, to discuss the matter. Id. at 3-4; Nielsen Dep. at 143:2-6. Nielsen forwarded the email exchange to Griffith, who commented that Walker's email was a "crazy, harsh rant like communication." Nierengarten Aff. Ex. 15 at 1. Griffith suggested that Walker be released rather than elevated to continuing contract status. Id. Nielsen agreed. Nielsen Dep. at 141:1-16, 142:17-25, 143:1-15. She informally documented the following reasons for her decision: (1) the dispute with Holine, (2) Walker's absence from the training session, (3) the email exchange with Max, and (4) Walker's failure to complete state-mandated evaluations on time. Nierengarten Aff. Ex. 16; Nielsen Dep. at 154:1-20.

On April 7, Nielsen told Walker that she was withdrawing her recommendation for contract renewal. According to Nielsen, she

told Walker that her decision was based on the above-stated circumstances. Nielsen Dep. at 156:21-157:1. Walker disputes Nielsen's account, testifying that Nielsen told her that her contract would not be renewed because she was "rude to [Max], and because [she] used the word diversity and it had racial overtones and there was no room for that in that email." Walker Dep. at 271:18-25. Walker explained to Nielsen that she believed Max's conduct was racially motivated and discriminatory. Id. at 272:1-6. Nielsen reportedly responded by saying "well, perception is everything, and so you're fired." Id. 272:6-7. Nielsen also met with Max, but did not discipline her. Nielsen Dep. 148:11-149:6.

Unsatisfied with Nielsen's explanation, Walker asked for more information a few days later. Nielsen told Walker that the fact that she had lied to Holine also contributed to her decision. Walker Dep. at 279:14-16. Walker explained that situation to Nielsen, but Nielsen was not persuaded. Id. at 279:15-23.

On April 11, the school board notified Walker that her employment contract was terminated due to poor performance.[4] Nierengarten Aff. Ex. 17. Before her non-renewal, Walker had never been disciplined or issued any kind of warning relating to her job performance. Nielsen Dep. at 109:13-19.

---

[4] The school board authorizes non-renewal decisions without undertaking an independent analysis. Griffith Dep. at 58:12-59:22.

Surprised by the school board's reference to "poor performance" as the reason for her non-renewal, Walker met with Griffith on April 25. Walker Dep. at 283:18-284:7. Griffith told her that she was only aware of the email exchange with Max as a basis for her non-renewal. Id. at 284:13-15. Griffith suggested a meeting with Nielsen to discuss the matter further. Id. at 285:15-286:1. Rather than do so, Walker filed a charge of race discrimination and reprisal with the Minnesota Department of Human Rights (MDHR). Nierengarten Aff. Ex. 19. On April 17, 2015, the MDHR issued a determination of no probable cause and dismissed the charge. Id. Ex. 20. The MDHR denied Walker's request for reconsideration. Id. Ex. 21.

On September 15, 2015, Walker commenced this suit against the District and Nielsen. The amended complaint alleges race discrimination and reprisal in violation of the Civil Rights Act of 1866, Title VII, and the Minnesota Human Rights Act (MHRA). Defendants now move for summary judgment.

## DISCUSSION

I.  **Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. Id. at 252.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. Id. at 255. The nonmoving party, however, may not rest on mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. Celotex, 477 U.S. at 324. A party asserting that a genuine dispute exists - or cannot exist - about a material fact must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Celotex, 477 U.S. at 322-23.

**II. Race Discrimination**

An employer may not discharge or otherwise discriminate against an employee because of her race. See 42 U.S.C. § 2000e-2(m) (Title VII); 42 U.S.C. §§ 1981, 1983 (Civil Rights Act of 1866); Minn. Stat. § 363A.08 subdiv. 2 (MHRA).[5] A plaintiff in an

---

[5] The court applies the same analysis to claims under federal and state law when, as here, the claims depend on identical facts and theories. See Clearwater v. Indep. Sch. Dist. No. 166, 231

11

employment action may survive a motion for summary judgment through direct evidence or through an inference of unlawful discrimination under the burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).  Direct evidence shows "a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action."  Humphries v. Pulaski Cty. Special Sch. Dist., 580 F.3d 688, 692 (8th Cir. 2009) (citation and internal quotation marks omitted).  Because Walker has not presented direct evidence of race discrimination, the court examines her claim under the burden-shifting analysis first set forth in McDonnell Douglas.

Under McDonnell Douglas, a plaintiff must first establish a prima facie case of discrimination.  Id.  The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  Id. at 692-93.  If the employer puts forth such a reason, the plaintiff then must produce evidence demonstrating that the employer's reason is pretext for unlawful discrimination.  Id. at 693.

---

F.3d 1122, 1124 n.2 (8th Cir. 2000) (Title VII and MHRA); Takele v. Mayo Clinic, 576 F.3d 834, 838 (8th Cir. 2009) (Title VII and § 1981).

**A.   Prima Facie Case**

To establish a prima facie case of race discrimination, Walker must show that she (1) is within the protected class, (2) was qualified to perform the job, (3) suffered an adverse employment action, and (4) has set forth facts that give rise to an inference of discrimination.[6]  Takele, 576 F.3d at 838.  There is no dispute that Walker is a member of a protected class or that her non-renewal constitutes an adverse employment action.  The remaining questions, then, are whether she was qualified for the position and whether the circumstances give rise to an inference of discrimination.

Defendants contend that Walker was not qualified to perform the job of school psychologist because her progress reviews show deficiencies in her performance.  The parties disagree as to the applicable standard.  Defendants argue that Walker must establish that she was "actually performing her job at a level that met her employer's legitimate expectations." Whitney v. Peer Review Sys., Inc., 221 F.3d 1053, 1055 (8th Cir. 2011) abrogated in part on other grounds by Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011).  Walker argues that at this stage of the

---

[6] Defendants argue that the last factor requires Walker to establish that similarly situated employees not within the protected class were treated differently.  Although that is one way to establish an inference of discrimination, it is not the only way.  Indeed, the "elements of a prima facie case vary with the circumstances of the alleged discrimination." Jones v. Frank, 973 F.2d 673, 676 (8th Cir. 1992).

analysis, she must only demonstrate her objective qualifications for the job, "not that [s]he was doing it satisfactorily." McGinnis v. Union Pac. R.R., 496 F.3d 868, 874 n.2 (8th Cir. 2007) (citation omitted).

Regardless of the standard applied, the record supports a finding that Walker was qualified for her position. She not only met the objective job requirements, she was repeatedly assessed as proficient in her job performance. Under these circumstances, Walker has established the second element of her prima facie case.

As to the final factor, several facts raise an inference of discrimination. Although defendants rely heavily on the assertion that Walker performed poorly throughout her tenure - most notably in regularly failing to submit timely evaluations - the record before the court does not corroborate such a finding.[7] Although there are vague references in the progress reports that Walker should "act with more intensity and/or a quicker pace" and that a challenge "will be keeping up on the paperwork," none of the progress reviews identify untimely reports, let alone a continual

---

[7] Defendants' reliance on the list of allegedly untimely evaluations in their interrogatory responses is insufficient to warrant summary judgment given the lack of underlying documentation and Walker's denial that she repeatedly submitted untimely evaluations. Walker's denial creates a genuine issue of material fact given that she does not, and could not, possess documentation to counter defendants' allegations. Defendants maintain all records bearing on this issue, and the court finds it curious that they did not submit such documentation in support of their motion.

problem with timeliness.  The only time it appears to have come up directly - in the dispute with Holine - Walker denied belatedly completing the evaluation.  There is no indication that Nielsen fully investigated the matter to determine what actually happened; she simply took Holine at her word without discussing it with Walker.

Nielsen's failure to fully investigate the other alleged bases for her decision to not renew Walker's contract also raises an inference of discrimination.  In addition to poor performance, defendants cite Walker's absence from a training session as a basis for her non-renewal.  But Nielsen never asked Walker why she was absent or whether she informed Dahlager that she would be absent. Nielsen Dep. at 159:6-20.  Had she done so, she would have learned that Walker was ill and that she had attempted to notify Dahlager of her absence by email the night before the training session. Instead, Nielsen spoke only to Dahlager.  Id. at 159:12-15.

As to the email exchange with Max, some of Walker's comments were certainly inflammatory and unprofessional, but Max's were as well.  See Redden Decl. Ex. 15 at 1-3.  Rather than try to resolve the issue, Nielsen decided to terminate Walker.  Further, although Max, as a continued contract employee, enjoys protections Walker did not as a probationary employee, there is no evidence that Max received any reprimand for her part in the dispute.  The wide

disparity in their treatment also raises an inference of discrimination.

Under all of the circumstances, Walker has established a prima facie case of discrimination.

**B.    Legitimate, Non-Discriminatory Reason for Non-Renewal**

An employer's burden of showing a legitimate, nondiscriminatory reason for termination is not onerous. Bone v. G4S Youth Servs., LLC, 686 F.3d 948, 954 (8th Cir. 2012) (citation omitted). Defendants have provided sufficient evidence to meet this low burden. Thus, the burden shifts back to Walker to demonstrate that defendants' proffered explanation is pretextual, and that discrimination is the true reason for the adverse action. Elnashar v. Speedway SuperAmerica, LLC, 484 F.3d 1046, 1055 (8th Cir. 2007).

**C.    Pretext**

"There are at least two ways [Walker] may demonstrate a material question of fact regarding pretext." Guimaraes v. SuperValu, Inc., 674 F.3d 962, 975 (8th Cir. 2012) (citation and internal quotation marks omitted). "She may show that [defendants'] explanation is unworthy of credence because it has no basis in fact, or she may show pretext by persuading the court that discriminatory animus more likely motivated [defendants]." Id. (citation omitted). "Either route amounts to showing that a prohibited reason, rather than [the] stated reason, actually

16

motivated" her termination. Id. (citation and internal quotation marks omitted).

Walker argues that positive performance reviews demonstrate that the reasons provided for her termination are pretextual. The court agrees. Her performance reviews reflect proficiency in her job, as do her supervisors' overwhelmingly positive comments about her performance. Although her supervisors also noted areas in which she could improve, none of the reviews mention that Walker routinely missed evaluation deadlines, as defendants now claim. As addressed above, defendants' evidence of missed evaluation deadlines is insufficient to definitively resolve the issue given Walker's denials and contrary evidence in other parts of the record. Indeed, it seems odd that none of the many performance reviews note Walker's inability to meet state-mandated deadlines on a regular basis.

As a general matter, "evidence of a strong employment history ... can be relevant when considering whether the record as a whole establishes a genuine issue of material fact." Strate v. Midwest Bankcentre, Inc., 398 F.3d 1011, 1020 (8th Cir. 2005) (citation omitted). Here, Walker's performance reviews, coupled with Nielsen's failure to fully investigate the allegations against Walker, create a fact issue as to whether defendants' stated reasons for not renewing Walker's contract were pretextual. As a result, defendants are not entitled to summary judgment on Walker's

17

race discrimination claims.

**III. Retaliation**

In the absence of direct evidence, federal and Minnesota retaliation claims are also analyzed under the McDonnell Douglas burden-shifting framework.[8] Guimaraes, 674 F.3d at 977-78. To establish a prima facie case of retaliation, Walker must show (1) she engaged in protected conduct, (2) she suffered an employment action that would dissuade a reasonable employee from making a charge of discrimination, and (3) that there is a causal connection between the two. Wright v. St. Vincent Health Sys., 730 F.3d 732, 737 (8th Cir. 2013) (Title VII and § 1981); Hoover v. Norwest Private Mort. Banking, 632 N.W.2d 534, 548 (Minn. 2001) (MHRA). To establish a causal connection, Walker must present evidence that gives rise to an inference of retaliatory motive. Kipp v. Mo. Hwy. & Trans. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002).

A person engages in protected conduct when she has "a good faith, objectively reasonable belief" that the conduct violates the law. Barker v. Mo. Dep't of Corr., 513 F.3d 831, 834 (8th Cir. 2008). Walker argues that she engaged in protected conduct when she reported Max for engaging in racially discriminatory conduct

---

[8] Walker argues that she has established direct evidence of discrimination because her email to Max referenced diversity and she was terminated shortly thereafter. When considered as a whole, the circumstances do not support a finding of direct discrimination. The court therefore will analyze the claim under McDonnell Douglas.

with respect to an African American student. Although a close call, the court agrees. Walker's email to Max was not a model of clarity, but she referenced "diversity" and "differentness" in discussing Max's attitude towards the African American student. Nielsen was copied on the email and, at least according to Walker, understood that Walker reported Max's conduct as discriminatory. See Walker Dep. at 271:18-25 (testifying that Nielsen told her that her use of the word diversity was inappropriate because it "had racial overtones"). Nielsen denies Walker's account, but the court must credit Walker's testimony at this stage of the proceedings. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).

Walker's testimony is likewise sufficient to create a fact issue as to whether there was a causal connection between her report of discrimination and her non-renewal. Thus, Walker has established a prima facie case of reprisal.

As discussed above, there is a genuine issue of material fact as to whether defendants' stated reasons for not renewing Walker's contract were pretextual. For those same reasons, there is a fact issue with respect to the issue of pretext. Therefore, defendants are not entitled to summary judgment on the reprisal claim.

**CONCLUSION**

Accordingly, based on the above, **IT IS HEREBY ORDERED** that the motion for summary judgment [ECF No. 19] is denied.

Dated: November 29, 2016

                                                 s/David S. Doty
                                                 David S. Doty, Judge
                                                 United States District Court